UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNFILTERED WITH KIRAN, LLC AND KIRAN CHAWLA** | **CIVIL ACTION NO. _____** |
| **VERSUS** | **JUDGE: _____** |
| **CITY OF BATON ROUGE/PARISH OF EAST BATON ROUGE AND MURPHY PAUL, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS CHIEF OF THE BATON ROUGE POLICE DEPARTMENT** | **MAGISTRATE-JUDGE: _____** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MEMORANDUM IN SUPPORT OF COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MAY IT PLEASE THE COURT:

**FACTS:**

Plaintiff, Unfiltered with Kiran, LLC, is an online media organization which routinely reports on the operation and functioning of defendant City-Parish, the BRPD, an Agency of the City-Parish, and BRPD Chief Paul, in addition to reporting on the community at large. Unfiltered with Kiran, LLC began as an online media organization in 2020, and was formally incorporated in 2021. Unfiltered currently has over 200,000 followers. Plaintiff, Kiran Chawla, is a nationally recognized reporter. She is employed by Unfiltered with Kiran, LLC and has been a news reporter for nearly sixteen (16) years. Ms. Chawla and Unfiltered won the prestigious Edward R. Murrow award for outstanding journalism in 2022. Ms. Chawla has also been the recipient of several Emmy awards, a prior Murrow award, and numerous awards for her reporting spanning her journalism career.

Unfiltered publishes online, including news articles, video news reels, investigative reports, features stories, and interviews with victims of crime affording them a public voice.

Unfiltered pursues the publication of news through interviews with public officials, receipt of and review of press releases, attendance at press conferences, news gathering through sources and public information, and also offers members of the general public a place to submit their "tips" for potential stories.  Included among many of Unfiltered with Kiran's news stories are investigative and informational reporting pieces involving activities of State, Parish, and Local political subdivisions and their officials.  Significantly, these news stories also include reporting regarding the City-Parish, the BRPD, and Chief Paul.

On September 1, 2022, Plaintiffs attended a press conference hosted by BRPD. The BRPD press conference had been publicly announced.  However, once Plaintiffs started live video streaming the press conference, Plaintiffs were asked to leave the press conference by City-Parish/BRPD personnel.  Defendant City-Parish/BRPD advised plaintiffs they were "not invited" to the press conference and were not therefore permitted to be in the room.  However, several other news outlets, members of the public, and reporters were not only present, but permitted to remain after plaintiffs were ordered out.  When plaintiffs asked why they were being removed, defendants offered no explanation.

Leading up to the September 1, 2022, press conference from which Plaintiffs were unceremoniously removed in front of their colleagues, the actions of the defendants, under color of authority, underscore the necessity for injunctive relief.

In July, 2020, plaintiffs reported on several billboards posted by the Baton Rouge Union of Police throughout the Baton Rouge area critical of defendants and, specifically, Chief Paul and the BRPD.  As a result, defendants were upset by the content of the plaintiffs' reporting and, thereafter, began excluding plaintiffs from access to press releases regularly issued by email to virtually every other media outlet in the Greater Baton Rouge and surrounding areas and removed

plaintiffs from the list of media outlets regularly receiving notice of press conferences held by defendants. When Plaintiffs contacted the Public Information Officer for the City-Parish, Mark Armstrong, by text requesting public information from the Mayor's office and comments regarding the billboards, Armstrong responded by claiming the information would not be provided to Plaintiffs because they were not "credentialed" by the Louisiana Association of Broadcasters and that:

> I am concerned about the lack of editorial oversight and peer review with your platform. I would request a letter from your editor to consider your platform as official media. Until your organization grows to include editors and additional content providers in a non-partisan organization, or if you are credentialed by LAB, then I will consider your platform a blog. Please know I contacted several media and public relations professionals on this issue. With that said, doing a blog is great and your determination is admirable. But know we typically only do interviews and media releases with credentialed media.

Thereafter, plaintiffs continued to report on issues within the community and City-Parish government. However, unlike other news outlets, Plaintiffs were denied access to public records, press releases when issued, and even notices of press conference. This meant Plaintiffs' reporting was often untimely and significantly delayed in providing information to the public.

On June 21, 2021, Plaintiffs posted articles and City-Parish, the BRPD, and Chief Paul including an article entitled, "Disparate Discipline within the Baton Rouge Police Department?". The content of the article focused on review of disciplinary statistics under defendant Chief Paul, allegations by at least one BRPD employee of retaliation by defendant Chief Paul and the BRPD, and included commentary from the Metropolitan Crime Commission Head in New Orleans. This publication further angered the defendants. Shortly thereafter, plaintiffs attempted to obtain copies of public records relating to an investigative piece involving the BRPD, requesting a comment from BRPD regarding the contents of the proposed news item, and also an interview with defendant Chief Paul. Plaintiffs were denied access to the public records, even though several

3

other news outlets had been provided copies immediately upon request and denied any response from the defendants.

On June 28, 2021, Plaintiffs attended a City-Parish Municipal Fire & Police Civil Service Board hearing regarding BRPD disciplinary matters. Before the start of the meeting, Plaintiffs, as did other news outlets present, approached defendant Chief Paul asking him for a comment. Although defendant Chief Paul had spoken with and given statements to the other news outlets present, defendant Chief Paul ignored Plaintiffs. When Plaintiffs questioned defendant Chief Paul why he would not speak with Plaintiffs and why Plaintiffs had been blocked from receiving press releases, defendant Chief Paul responded it was because of Plaintiff Chawla's "credibility" referring to the content of Plaintiffs' reporting critical of the defendants.

Following the meeting, defendant Chief Paul again gave comments to every news outlet present except for the Plaintiffs. When the Plaintiffs again asked defendant Chief Paul why they were being denied access to public records, press releases, and even an interview (as defendant Chief Paul had given to the other news outlets present), defendant Chief Paul falsely advised Plaintiffs there is a "policy" "you gotta go through them" [referring to the Public Information Office of the BRPD]. Defendant Chief Paul then advised Plaintiffs they were not "fair" and not "impartial" and that it was "personal." When Plaintiffs advised they had been trying to obtain information through the Public Information Office of the BRPD without response and that the PIO had advised Plaintiffs it was defendant Chief Paul who was blocking access to the public information, defendant Chief Paul then falsely accused Plaintiff Chawla of pointing her finger at him, turned to others surrounding the area asking them to "document that", and continued to falsely iterate "there's a process."

Plaintiffs then contacted the PIO for the BRPD in an attempt to obtain public information, press releases, and to obtain a reason for being treated differently from virtually all other news outlets. On July 6, 2021, Plaintiffs submitted requests for public information regarding an officer under discipline. In response, BRPD responded that her "request" needed to be submitted through the City-Parish Public Records "portal", to which Plaintiff Chawla responded she has not had to do that in the fifteen (15) years she has worked as a reporter in Baton Rouge. In addition, other news outlets had direct access to the PIO officers who routinely provided timely information and commentary. Yet, in the instance of Plaintiffs, the provision of information was either denied or delayed to such an extent the items were no longer newsworthy or of public interest. On July 8, 2021, L'Jean McKneeley, spokesperson of the PIO for BRPD acting under direction of defendant Chief Paul, responded: "[T]he Baton Rouge Police Department reserve (sic) the right to interview with reporters/interviewees **who the department deem as impartial to incidents that may occur** within the department or that is of importance to the community and but not limited to any individuals (sic) safety and knowledge." A copy of the July 8, 2021, McKneeley email is attached to the Plaintiffs' Affidavit of Irreparable Harms.

On August 21, 2021, Plaintiffs texted Don Coppola, Supervisor of the PIO for the BRPD again inquiring as to why she was being denied public records, including a recent request for a probable cause affidavit for an arrestee, and being denied access to press releases being issued by the BRPD to virtually all other media outlets in the area. Plaintiffs' requests for the public information were denied and BRPD stopped responding to Plaintiffs. Thereafter, defendant City-Parish began requiring Plaintiffs to submit requests for public information and documents through a public records "portal", often delaying the provision of information for days and weeks at a time. Whereas other news outlets were immediately provided information requested from the PIO for

5

the City-Parish and for the BRPD without delay or requirement that the requests be submitted through a "portal." As a result, Plaintiffs' ability to provide timely information and news to the public has been, and continues to be, significantly retarded and impaired.

On July 4, 2022, Plaintiffs requested public information regarding BRPD officer Donald Steele who was facing accusations of improper conduct. Instead of providing the information requested regarding the public officer, defendants required Plaintiffs to "submit all questions for the Baton Rouge Police Department to the Public Records Request Portal located on the City Parish Website at BRLA.GOV." Yet, all other news outlets in the Greater Baton Rouge and surrounding areas were not required to submit their inquiries for public information through the "portal" and, instead, were permitted to directly contact the Public Information Office of the BRPD and the Public Information Office of the City-Parish, which generally and immediately responded without delay thereby permitting those news outlets to provide the public with the information in a timely manner. Although Plaintiffs submitted the request, as instructed, Plaintiffs were advised by the defendants the "custodian of records" would need more time to find the documents. The documents and public information were not issued to Plaintiffs until seventeen (17) days later on July 21, 2022, and, additionally, the documents and public information ultimately provided were not responsive to Plaintiffs' original request.

On July 6, 2022, other counsel for the Plaintiffs submitted a formal requests for information, pointing out that Plaintiffs enjoy clearly established rights to access under the United States Constitution and La. Const. Art. XII, Section 3, in addition to La. R.S. 44:1, *et seq.* and La. R.S. 45:1451 which defines "news media" and includes Plaintiffs within the definition. A copy of the correspondence is attached to the Affidavit of Irreparable Harm. On July 11, 2022, before receiving a response to Plaintiffs' counsel's email, Plaintiffs filed a request via the public request

portal intended for the general public. Thereafter, Deelee Morris, counsel for BRPD, responded to Plaintiffs' counsel's email, and stated "[A]s per BRPD General Order 139, Public Information Officers may communicate with authorized news media representatives which is defined as 'those individuals who are directly employed by agencies of the electronic or print media such as radio, television and newspapers.' The policy specifically states that 'free-lance workers in this field are to be regarded as other members of the general public unless otherwise designated by the Chief of Police.' Based on the information provided, Ms. Chawla is a free-lance reporter and/or is not employed by a media agency as contemplated by the policy. As always, Ms. Chawla may obtain any public information by submitting a public records request at [Baton Rouge LA | Public Records Center (govqa.us)](#)." The July 11, 2022, correspondence is attached to the Affidavit of Irreparable Harm. Yet, upon information and belief and therefore Plaintiffs allege, the Public Information Officer gave a comment and timely public information to a reporter from the Advocate regarding the same story that Unfiltered with Kiran covered.

 Plaintiffs continued to attempt to work with the defendants in an attempt to obtain public information in order to inform the public and these attempts continued to be denied or delayed by such a margin that when the information was finally provided, it was no longer newsworthy or of interest to the public. This was also due, in large measure, because the defendants, who denied access to the public information to the Plaintiffs, actually provided the same information to news outlets almost immediately upon request allowing other news outlets to publish the information days, if not weeks, ahead of the Plaintiffs thereby denying the Plaintiffs the ability to inform the public in a timely fashion. These attempts include: July 19, 2022, Plaintiffs emailed Officer McKneely seeking information and/or an interview with Chief Paul or anyone in the administration who would discuss the rehiring of Officer Michelle Patterson with no response as of this date;

7

August 3, 2022, Plaintiffs emailed Officers Coppola and McKneely requesting a probable cause document regarding Zachary Sibille and on August 4, 2022, City-Parish Attorney Deelee Morris responded Plaintiffs must submit a public records request via the portal on the City/Parish's website; August 31, 2022, Plaintiffs sought public information from BRPD as to whether or not Richmond Barrow is with the department, with no response as of this date.

Defendants refuse to send Plaintiffs press releases and, instead, send the press releases to other news outlets to the detriment of the Plaintiffs and the public's right to know. Defendant Chief Paul has also publicly exclaimed he will not provide information to Plaintiffs because of their "credibility". Further, defendant City/Parish personnel from the Mayor's office advised Plaintiffs they are just a "blogger" and therefore have no right of access guaranteed to the press.

Defendant City-Parish, through Armstrong, advised Plaintiffs that the defendants did not consider Plaintiffs a reporter or media or a news outlet and, instead, had imposed an arbitrary "requirement" that Plaintiffs be "credentialed." Solely in an attempt to try and resolve the ongoing issues of denial of access and timely access to public information, Plaintiffs obtained "credentials" from the Louisiana Press Association. A copy of same are attached to the Affidavit of Irreparable Harm. Despite the fact Plaintiffs obtained "credentials", which are nowhere required under the law or any policy in order for Plaintiffs to be treated in a similar fashion as other news outlets, defendants continue to refuse Plaintiffs press releases, notices of press conferences, and timely access to public information and records. This included the removal of Plaintiffs from a public press conference held at BRPD on September 1, 2022, as set forth herein.

Following the September 1, 2022, removal from the public press conference at BRPD, Plaintiffs were initially denied access to a press conference held by the Mayor, Chief Paul, the City-Parish, and BRPD, on September 22, 2022 following the murder of an LSU student on

8

Government Street. The murder garnered national media attention. Yet, the press conference was "held" behind a door with persons stationed at the door who admitted virtually all other news outlets to attend the public press conference, including members of the public, except Plaintiffs. After Plaintiffs waited nearly fifteen (15) minutes to attend the press conference, Plaintiffs were finally let into the room where the press conference had begun, thereby denying Plaintiffs' access to and timely access to information for the public. Following the press conference, Plaintiffs, along with the other news outlets to the public hallway on the 7th floor of the Governmental Building. While other news outlets were questioning the press conference attendees and gathering information, Plaintiffs were ordered to move to the 3rd floor by staff from the Mayor's office and BRPD. While on the 3rd floor, a press conference attendee, gave an interview with WVLA Channel 33 and then approached Plaintiffs to give an interview with Plaintiffs. Plaintiffs began live streaming the interview when, almost immediately, members of the Mayor's staff walked over to Plaintiffs and told the interviewee he needed to leave immediately for an impromptu "private" meeting with the Mayor and Chief. Defendants deliberately interfered with Plaintiffs news gathering while permitting every other new outlet in attendance to interview and obtain public information regarding the Government Street murder, and to the complete exclusion of Plaintiffs.

Plaintiffs submit, unless restrained, the defendants have and will continue to violate their clearly established rights under the 1st and 14th Amendments to the United States Constitution, the Louisiana Constitution, Federal and Louisiana law. As oft stated, the public has a right to know. Where, as here, public bodies and their officials deliberately interfere with the freedom of the press and, importantly, the right of the public to obtain information about theme, those actions must be enjoined.

**LAW AND ARGUMENT:**

                1.    Standard for Injunction

Fed.R.Civ.P. Rule 65 provides for the issuance of injunctive relief. In order for injunctive relief to be granted, the moving party must demonstrate the following four (4) factors: 1) a substantial likelihood of success on the merits, 2) a substantial threat of irreparable injury if the injunction is not issued, 3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and 4) that the grant of an injunction with not disserve the public interest.[1]

Within the ambit of First Amendment protections, two (2) significant corollaries exist. As clearly established, "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[2] "Injunctions protecting First Amendment freedoms are always in the public interest."[3]

                2.    Substantial Likelihood of Success on the Merits

In addition to the well-trod path that First Amendment intrusions, even for a moment, constitute irreparable harm, the present plaintiffs amply demonstrate the defendants' actions fit the bill. At the outset it is noted the law does not require, much less make distinction, between a "reporter" versus a non-reporter where the First Amendment freedom of the press is concerned. The fundamental aim of the First Amendment is a right belonging to the public. That right is the right to be informed.

---

[1] *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 537 (5th Cir. 2013), citation to *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009) and *Spears v. Kruse*, 445 F.3d 396, 399-400 (5th Cir. 2006)
[2] *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and additional citations noted at *Texans for Free Enter.*, *supra* at fn 7
[3] *Texans for Free Enter., supra* at 539, citation to *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)

In *Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011), the Court was confronted with the issue of whether or not a bystander enjoyed a First Amendment right to freedom of the press to videotape police officers arresting another in public. Mr. Glik, who videotaped the arrest incident, was himself later arrested after he refused to stop videoing the officers' actions. Finding no distinction between a reporter or Mr. Glik for the purposes of First Amendment protection, the Court opined:

> It is of no significance that the present case, . . . involves a private individual, and not a reporter, gathering information about public officials. The First Amendment right to gather news is, as the Court has often noted, not one that inures solely to the benefit of the news media; rather, the public's right of access to information is coextensive with that of the press. *Houchins* [*v. KQED, Inc.*] 438 U.S. 1, 16, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978) (Stewart, J., concurring) (noting that the Constitution 'assure[s] the public and the press equal access once the government has opened its doors'); *Branzburg* [*v. Hayes*], 408 U.S. 655, 684, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) ('[T]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally')[4]

Indeed, whether or not present defendants failed to consider Plaintiffs, and specifically Ms. Chawla a 20-year veteran reporter, "media" or a "reporter" or even a "blogger" does not excuse their repeated intrusions upon the Plaintiffs' First Amendment rights. Here, the Court in *Glik* recognizes the obvious:

> . . . Moreover, changes in technology and society have made the lines between private citizen and journalist exceedingly difficult to draw. The proliferation of electronic devices with video-recording capability means that many of our images of current events come from bystanders with a ready cell phone or digital camera rather than a traditional film crew, and news stories are now just as likely to be broken by a blogger at her computer as a reporter at a major newspaper. **Such developments make clear why the news-gathering protections of the First Amendment cannot turn on professional credentials or status**.[5]

Yet, in this case, the defendants denied Plaintiffs access to and timely access to public information claiming Plaintiffs were not media and, in the instance of City-Parish, by claiming some sort of "credentialing" pursuant to an unwritten "policy" was otherwise required. Put simply, the law

---

[4] *Glik*, *supra* at 83-84
[5] *Glik supra* at 84 (emphasis added)

11

does not discriminate between the character of the individual possessing the First Amendment right, only that the First Amendment right to gather news be protected.[6]

In *The Times-Picayune Publishing Corp. v. Lee*, 1988 U.S. Dist. LEXIS 3506 (E.D. La. 4/15/88), the Court issued a preliminary injunction where Sheriff Lee, upset with certain coverage of his office, instructed his Public Information Officers to require the Plaintiffs to submit written requests for information, to not provide Plaintiffs notice of press conferences or "newsworthy events", and to exclude certain reporters from press conferences. Lee's instructions also led to his office giving newsworthy information contemporaneously to other news outlets, while withholding the information for hours, if not longer, from the Times Picayune. "No other media organization is required to engage in his procedure to obtain information from the Jefferson Parish Sheriff's Office. All other news organizations can routinely obtain information over the telephone in response to oral questions, when they desire." *The Times-Picayune/Lee, supra* at *16. In issuing the preliminary injunction, the Court found Sheriff Lee's policies applicable to the Times Picayune alone "materially and adversely impaired" the paper's ability to gather and report news in a timely, comprehensive, and informative manner. Delaying the provision of information to the paper, especially where Lee was treating other news outlets preferentially, materially and adversely curtailed the "flow of information to the public about such vital subjects as crime, law enforcement and the conduct of government and public officials" *Times-Picayune/Lee supra* at *19-20. The Court concluded the actions of Lee were "discriminatory" against the plaintiffs and content-based

---

[6] See: 5 U.S.C. § 552, the term "a 'representative of the news media' means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. In this clause, the term news means information that is about current events or that would be current interest to the public…Moreover, as methods of news delivery evolve (for example, the adoption of the electronic dissemination of newspapers through telecommunication services), such alternative media shall be considered to be news-media entities."

retaliation violative of the First Amendment. No compelling governmental interest existed and the Court rejected the notion that ensuring "accuracy" of the reporting qualified.

In this case, the Plaintiffs show the exclusionary policies and practices of the defendants, and, particularly, Chief Paul himself the subject of several articles by the Plaintiffs which he did not like, violate their rights, and represent irreparable harm. Addressing the issue with Sheriff Lee, the *Times-Picayune/Lee* Court emphasized the lack of a compelling governmental interest especially where the government official (there, Lee, here, Chief Paul) is the one enforcing the discrimination "which he purports to purify of inaccuracy."

In *Citicasters Co. v. Finkbeiner*, 2007 U.S. Dist. LEXIS 113246 (N. D. Oh 1/31/07), the Court issued an injunction nearly identical to that issued in *Times-Picayune/Lee*. Indeed, citing to *Times-Picayune*, the *Citicasters* Court held the defendants' attempt to characterize the plaintiffs as a "talk show" and not a newscast was unavailing and excluding the plaintiff from press conferences and denying advance notice of press conferences, violated the plaintiffs' First Amendment rights. "The Court found that it 'would defeat the whole purpose which brings the Plaintiffs here, which is to insure to the maximum extent possible equivalence of access to public officials when they decide to speak to the public on their behalf or on behalf of the City. That's what a free press is all about.'" *Citicasters supra* at *9-10.

Plaintiffs show the press conference from which they were unceremoniously removed, interview opportunities blocked by the Mayor's office literally pulling the interviewee away from the Plaintiffs as they began their interview, denials of press releases, and denials of access to press conferences each occurred on public property, by public officials, and/or using public resources. "In our society, police officers are expected to endure significant burdens caused by citizens

13

exercise of their First Amendment rights."[7]  This, in the words of the Courts is what distinguishes a free state from a police state.

It is, after all, "firmly established that the First Amendment's aegis extends further than the text's proscription on laws 'abridging the freedom of speech, or of the press', and encompasses a range of conduct related to the gathering and dissemination of information."  "The First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw."[8]  There is, according to the Supreme Court as stated in *Houchins, supra* at 11, an "undoubted right to gather news from any source by means within the law."

Citing to *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), the Supreme Court in *Elrod v. Burns*, 427 U.S. 347, 373-374, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), reiterated:

> . . . It is clear, therefore, that First Amendment interests were either threatened or in fact being impaired at the time relief was sought.  A denial of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable harm.

There is a substantial likelihood of success on the merits present here.

### 3.   Substantial Threat of Injury if Injunction is Not Issued

Plaintiffs have been denied access to public information, press releases issued to other news outlets and to the exclusion of the plaintiffs, removal from a press conference and denial of the ability to attend (even in public places), and direct interference with plaintiffs' ability to deliver information to the public.  These actions violate the Constitutions and the law.

---

[7] *Glik supra* at 84, citation to *City of Houston v. Hill*, 482 U.S. 451, 461, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987)
[8] *Glik supra* at 82, citation to *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 783, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978); *Stanley v. Georgia*, 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969)

Much akin to the circumstances present here, the Court in *Alaska Landmine, LLC v. Dunleavy*, 514 F.Supp.3d 1123 (D.C. Ak 1/22/21) issued a preliminary injunction at the request of a "non-credentialed" journalist. Alaska Landmine is an online news site and Mr. Landfield, its owner. Both were plaintiffs in the case. The *Alaska* plaintiffs published entirely online. The defendants were the Governor of Alaska, his Chief of Staff, and Deputy Communications Director. The *Alaska* plaintiffs alleged they no longer received invitations to press conferences and, instead, the Governor's office maintained what it called a "media advisory list" which it used to email certain members of the press in advance of scheduled press conferences. Upon their exclusion from "invitation" to press conferences, the *Alaska* plaintiffs sought a preliminary injunction ordering the defendant to include them on their media advisory list and to treat them like any member of the mainstream (traditional) media. As with present plaintiffs, the *Alaska* plaintiffs had attempted to resolve their differences, including directly asking to be included on the list to receive notices of press conferences, to no avail.

In *Alaska*, as here, the defendants articulated their reason for denial of access because they followed an unwritten "no blogger" policy, and asserted that was "the impetus for Plaintiffs' exclusion." *Alaska*, at 1134. Defendants also argued that the *Alaska* Plaintiffs were not "credentialed" members of the media and, therefore, were not "media." Rejecting the arguments, the Court issued the injunction finding, as to the unwritten policy (as is the case with City-Parish here), "unwritten polices are per se violations of due process." *Alaska*, at 1132, 1133: the government's argument constituted a "vexing syllogism if ever there was one." "The harms associated with a First Amendment violation cannot typically be redeemed with damages. 'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury,'" *Alaska*, at 1134-1135. Therefore, the Court granted the injunction finding:

15

"[W]ithout an injunction enjoining the government from excluding Mr. Landfield from their media advisory list absent a consistently applied neutral invitee policy, Plaintiffs are subject to irreparable harm."

In this case, the present Plaintiffs have been and are being excluded from receiving press releases, from receiving notification of press conferences, and access to public information from the City-Parish, its Agency the BRPD, and Chief Paul. Plaintiffs, although engaged in news gathering, are clearly being treated differently on account of either content retaliation and/or arbitrary limitation which the Constitution does not permit. As cited by the *Alaska* Court, the D.C. Circuit in *Sherill v. Knight*, 569 F.2d 124, 125 (D.C. Cir. 1977), involving injunctive relief arising from the denial of a White House press pass held:

> Not only newsmen and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information.

The First Amendment exists not for the protection of the press, but for the protection of the flow of information to the public. This, in the case at bar, is being and has been dammed, stopping the flow of information to the public.

Indeed, even in an attempt to placate the absurd "unwritten" policy of the City-Parish that the Plaintiffs be "credentialed" (as Plaintiffs are), the City-Parish and Chief still refuse to afford access to the Plaintiffs. Their justification for doing so is unknown. The effects of their actions are unlawful.

Absent an injunction requiring the defendants to treat the Plaintiffs in the same fashion as all other news outlets, the intrusion of the Plaintiffs' (and public's) First Amendment and Fourteenth Amendment Rights will continue. That result is one plainly unconscionable under the Constitution and laws of this Country and of this State.

4. Threatened Injury if the Injunction is not Granted Outweighs any Harm if Granted and the Public Interests are not Disserved

Lastly, if the requested injunctive relief is not granted, the First Amendment rights of the Plaintiffs will continued to be trampled. As stated, the First Amendment right to freedom the press exists precisely in service to the public interest. It therefore follows that the public's interests in obtaining information about the functions of its public entities and officials, if denied as has occurred here, will be disserved should injunctive relief not issue.

The rights present are firmly entrenched in the United States. When deciding a similar issue arising from the delayed production of newsworthy items, the 7th Circuit in *Grove Fresh Distribs., Inc. v. Everfresh Juice Co.,* 24 F.3d 893, 897 (7th Cir. 1994), stressed the importance of the right even adding:

> . . . in light of the values which the presumption of access endeavors to promote, a necessary corollary to the presumption is that once found to be appropriate, access should be immediate and contemporaneous. . . The newsworthiness of a particular story is often fleeting. To delay or postpone disclosure undermines the benefit of public scrutiny and may have the same result as complete suppression. . . [9]

The defendants in this case not only exclude Plaintiffs from press conferences at which all other news outlets are invited and attend, but also deliberately delay Plaintiffs' access to information. Yet, the defendants willingly and freely disclose newsworthy information to other news outlets, without requiring those outlets to jump through the hoops arbitrarily required of the Plaintiffs, to-wit, submitting a request through a "portal" like a black hole with little or no response.

As in *United States v. Edwards*, 823 F.2d 111, 119 (5th Cir. 1987), captured by the *Courthouse News/Jackson* Court at *supra* *12-13, unnecessary delay in access to the information must be avoided. "Assuming, *arguendo*, that Defendants have an overriding interest [in delaying

---

[9] Also as cited by the Court in *Courthouse News Serv. v. Jackson*, 2009 U.S. Dist. LEXIS 62300 at *11 (S.D. Tx. 7/20/09)

17

disclosure], the Court finds that they have failed to demonstrate that the 24 to 72 hour delay in access is narrowly tailored to serve such an interest and that no less restrictive means of achieving that interest exists." In this case, the defendants offer no justification for singling out the Plaintiffs and requiring the Plaintiffs, as opposed to all other news outlets deemed "worthy" by the defendants, to be delayed in their attainment of information. Those delays inherently represent unconstitutional infringements of the Plaintiffs' rights and as stated by the Court, the unilateral imposition by the defendants of delay and postponement "undermines the benefit of public scrutiny" having the same result as complete suppression. Each day is a "separate and cognizable infringement of the First Amendment." *Grove Fresh*, at 897, citation from *Courthouse/Jackson*, *11.

## CONCLUSION:

A founding principle of this Country is the ability for our citizens to uncover the truth behind our government's actions. In April 1735, the "truth is my defense" were the words spoken by John Zenger when he was indicted for seditious libel for criticizing the governor of New York. Plaintiffs are just like Zenger who started his own publishing company in New York when the United States toiled under rule by the British Crown. Zenger used his words to criticize the governor. Afterall, "when it comes to the First Amendment, . . . we are concerned about government chilling the citizen—not the other way around." *Horvath v. City of Leander*, 946 F.3d 787, 802 (5th Cir. 2020).

Intrusions upon First Amendment freedoms, even for a moment, cannot be tolerated in a free and open society. Knowledge is power and information is king. Restricting the public's access to either propels society backwards leaving an uninformed populous stripping away the robust discourse upon which this Country was founded.

For these reasons and those patent in the record, injunctive relief should be granted.

                        Respectfully submitted,

                        By: ____s/Jill L. Craft_____
                        Jill L. Craft, T.A., #20922
                        W. Brett Conrad, Jr., #37639
                        329 Saint Ferdinand Street
                        Baton Rouge, Louisiana  70802
                        (225) 663-2612
                        jcraft@craftlaw.net;bconrad@craftlaw.net